# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI
# AT SAINT LOUIS

| | |
|---|---|
| THE ART MUSEUM SUBDISTRICT OF THE METROPOLITAN ZOOLOGICAL PARK AND MUSEUM DISTRICT OF THE CITY OF SAINT LOUIS AND THE COUNTY OF SAINT LOUIS,<br><br>                Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>    SERVE:<br>    Richard C. Callahan,<br>    United States Attorney<br>    Eastern District of Missouri,<br>    Thomas Eagleton U.S. Courthouse,<br>    111 S. 10th Street, 20th Floor,<br>    Saint Louis, Missouri  63102<br><br>    and<br><br>    SERVE:<br>    Eric H. Holder<br>    United States Attorney General<br>    Department of Justice<br>    950 Pennsylvania Avenue, NW,<br>    Washington, DC  20530<br><br>JANET NAPOLITANO, Secretary,<br>United States Department of Homeland Security,<br>    SERVE:<br>    Janet Napolitano<br>    Department of Homeland Security,<br>    Washington, DC  20528<br><br>and<br><br>ERIC H. HOLDER, Attorney General of the United States,<br>    SERVE: | Case No. _____<br><br>**DEMAND FOR JURY TRIAL** |

|  |  |
|---|---|
| Eric H. Holder | ) |
| United States Attorney General | ) |
| Department of Justice | ) |
| 950 Pennsylvania Avenue, NW, | ) |
| Washington, DC  20530 | ) |
|  | ) |
|  | ) |
|  | ) |
| Defendants. | ) |
| _____) |  |

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW The Art Museum Subdistrict of the Metropolitan Zoological Park and Museum District of the City of St. Louis and the County of St. Louis, operating as The Saint Louis Art Museum ("Museum"), and for its cause of action against Defendants United States of America, Janet Napolitano, Secretary of the United States Department of Homeland Security ("Secretary"), in her official capacity, and Eric H. Holder, Attorney General of the United States ("Attorney General"), in his official capacity, alleges and states as follows:

### NATURE OF THE ACTION AND RELIEF SOUGHT

1.     This is a civil action for declaratory relief concerning the ownership and possession of an Egyptian mummy mask known as the Mask of Ka-Nefer-Nefer ("Mask"), an approximately 3,200 year old Egyptian cartonnage mummy/funerary mask, which was discovered in 1952, purchased by the Museum in 1998 and remains owned and possessed by the Museum.

2.     Pursuant to 19 U.S.C. §§ 2201-02, the Museum respectfully seeks declaratory relief to declare the respective rights of the parties with regard to the Mask, specifically that (1) the right of the United States to seek seizure and/or forfeiture pursuant to the provisions of the Tariff Act of 1930 ("Tariff Act") is foreclosed by the applicable statute of limitations set forth in

KCP-4099426-3

19 U.S.C. § 1621, and (2) the provisions of Egyptian Law No. 215 do not establish the Mask is Egypt's property, nor can the Defendants establish reasonable cause to believe the Mask was "stolen, smuggled, or clandestinely imported or introduced" into the United States pursuant to 19 U.S.C. § 1595a.

## PARTIES

3. Plaintiff Museum is a sub-district of the Metropolitan Zoological Park and Museum District of the City of St. Louis and the County of St. Louis (the "District"). Pursuant to Mo. Rev. Stat. § 184.362, both the District and any sub-district, including the Museum, are political subdivisions of the state of Missouri. The Museum's principal place of business is at One Fine Arts Drive, Forest Park, Saint Louis, Missouri 63110.

4. Defendant United States of America ("United States") is a sovereign public entity comprised of various governmental agencies, including the United States Department of Homeland Security. The United States can be served through Richard C. Callahan, United States Attorney for the Eastern District of Missouri, at the Thomas Eagleton U.S. Courthouse, 111 S. 10th Street, 20th Floor, Saint Louis, Missouri 63102, and by serving Eric H. Holder, the United States Attorney General, at the Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530.

5. Defendant Janet Napolitano is the Secretary of the United States Department of Homeland Security ("DHS"). The Homeland Security Act of 2002 and 6 U.S.C. §§ 203(1), 551(d), 552(d) and 557, transferred the non-revenue functions of the United States Customs Service ("Customs") to the enforcement Bureau of Customs and Border Protection ("CBP") of DHS. Pursuant to 19 U.S.C. § 1595a and 19 C.F.R. § 162.21, Customs is authorized to seize and/or cause the forfeiture of merchandise for which there is reasonable cause to believe was "stolen, smuggled, or clandestinely imported or introduced" into the United States. Thus, the authority for seizures and/or forfeitures under 19 U.S.C. § 1595a and 19 C.F.R. § 162.21 now

resides with DHS.  DHS can be served at the United States Department of Homeland Security, Washington, DC  20528.

6. Defendant Eric H. Holder is the Attorney General of the United States ("Attorney General").  The Department of Justice represents the United States in controversies arising under The Tariff Act and has, to date, acted as counsel for the Government in this matter.  The Attorney General can be served at the Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC  20530.

## JURISDICTION AND VENUE

7. This declaratory judgment action arises under the Tariff Act, 19 U.S.C. §§ 1595a and 1621.  This Court has jurisdiction under 28 U.S.C. §§ 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  Venue is proper under 28 U.S.C. § 1391.  This action is ripe for declaratory judgment, as there now exists an actual controversy capable of immediate relief under federal law between parties within this jurisdiction.  *See*, Affidavit of David A. Linenbroker, attached hereto and marked as Exhibit A.

## STATUTORY BACKGROUND

8. The Tariff Act of 1930, 19 U.S.C. §§ 1 *et seq.*, was designed primarily to overhaul United States tariff rates.  Included in the Tariff Act are the United States Customs Laws, which regulate trade, customs, and immigration.  As stated above, the Tariff Act, 19 U.S.C. §1595a, authorizes the CBP, an enforcement bureau of DHS, to seize and cause the forfeiture of merchandise for which there is reasonable cause to believe was "stolen, smuggled, or clandestinely imported or introduced" into the United States.

9. 19 U.S.C. § 1621 provides, however, that any action for forfeiture pursuant to the search and forfeiture provisions of 19 U.S.C. § 1595a must be commenced within five-years after the time when the alleged offense is discovered, or in the case of forfeiture, within two-

years after the time when the involvement of the property in the alleged offense was discovered, whichever was later.

## FACTUAL ALLEGATIONS

A.  **The Provenance of the Mask**

10. In or about 1952, the Mask of Ka-Nefer-Nefer was discovered during an excavation of the unfinished Step Pyramid of the Third Dynasty ruler Sekhemkhet on the Saqqara necropolis. The excavator was Mohammed Zakaria Goneim ("Goneim").

11. In the early 1960s, the Mask was a part of the Kaloterna (or Kaliterna) private collection, during which time it was purchased by Ms. Zuzi Jelinek ("Jelinek"), a Croatian collector in Switzerland. In or around 1995, Jelinek sold the Mask to Phoenix Ancient Art, S.A. of Geneva ("Phoenix"). On or about April 3, 1998, the Museum purchased the Mask from Phoenix.

B.  **The Museum's Investigation of the Mask's Provenance and Purchase of the Mask**

12. In or around September 1997, the Museum initiated a months-long process for investigating the provenance of the Mask with the intention of purchasing the Mask from Phoenix. The Museum made multiple inquiries regarding the Mask's provenance, hired outside American and Swiss counsel, and made numerous inquiries within the museum community. Phoenix provided several letters and articles supporting the purchase of the Mask from Jelinek and Jelinek's purchase of the Mask from the Kaloterna private collection.

13. Through counsel, the Museum also had contact with several individuals and entities particularly situated to know whether or not the Mask was stolen, including but not limited to Dr. Mohammed Saleh ("Dr. Saleh"), at the time, the Director of the Museum of Egyptian Antiquities in Cairo (the "Egyptian Museum"), Egypt's central repository for Egyptian antiquities; Swiss counsel engaged specifically to investigate the Mask's provenance; The Art Loss Register; INTERPOL; the International Federation of Art Research; and the Missouri

5

Highway Patrol (as an INTERPOL constituent).  Of particular relevance is a contact with the Federal Bureau of Investigation.  These contacts include the following:

a. As part of the provenance investigation, in or around late-October 1997, the Museum arranged for a package containing the description of the Mask, photos, and a letter explaining the Museum's intention to purchase the Mask to be hand-delivered to Dr. Saleh, Director of the Egyptian Museum, inquiring about the Mask.  In the letter, the Museum asked Dr. Saleh if he was familiar with the Mask or if he knew of any parallels to the Mask.

b. On or about February 10, 1998, counsel for the Museum requested a Swiss attorney to conduct a background investigation of Phoenix, its owners, and Jelinek.  Museum counsel received responses from the Swiss attorney on February 18 and March 31, 1998, confirming a Suzana Jelinek resided at the address provided by Phoenix, and confirming Phoenix's company existence, Dun & Bradstreet rating, and that there were no liens or encumbrances on business property belonging to Phoenix.

c. On or about February 16, 1998, counsel for the Museum sent identical letters and photographs of the Mask to the Art Loss Register ("ALR"), INTERPOL, and the International Federation of Art Research ("IFAR") requesting confirmation the Mask was not listed in their respective databases of stolen art.

d. On or about February 23, 1998, counsel for the Museum received a letter from R.E. Kendall, Secretary General of INTERPOL, advising that the Museum's request had been forwarded to the U. S. Department of Justice's National Central Bureau, in Washington, DC, for "action they may deem necessary."

e. On February 27, 1998, the Museum sent a letter to the Missouri Highway Patrol requesting a search of the Interpol database for the Mask and a background check on Hicham Aboutaam and Phoenix, and forwarded a photograph of the Mask to the Missouri Highway Patrol on March 4, 1998.

    f. On March 9, 1998, and after several un-returned phone calls, e-mails, and letters, the Museum received a hand-written fax from Dr. Saleh, in which he pointedly declined to identify the mask as stolen or otherwise improperly held, and further advised the Museum to consult an American museum with a similar collection of objects to get further advice.

    g. In mid- to late-March 1998, the Museum received the results of an independent investigation of the Mask's provenance conducted by a well respected and authoritative scholar, which indicated the Mask had in all likelihood left Egypt lawfully under then-applicable Egyptian law.

14. Based on the Museum's due diligence investigation of the Mask's provenance, including the background checks of Phoenix and Jelinek; Dr. Saleh's response; the report of the ALR that the Mask was not listed as stolen in its database and independent findings and analysis, the Museum purchased the Mask on April 3, 1998.

C. **Allegations about the Mask and Communications With the Government Regarding the Mask's Provenance**

15. In December of 2005 and January of 2006, the United States government was a party to several communications regarding the Mask's provenance:

    a. On December 31, 2005, Ton Cremers ("Cremers"), operator of the Amsterdam based Museum Security Network,[1] sent an email to the Museum and several United States government officials, including Bonnie Magness-Gardiner ("Magness-Gardiner") of the Federal Bureau of Investigation (FBI"), where she is the manager of the FBI's Art Theft Program.[2] As the name suggests, the Art Theft

---

[1] The Museum Security Network mailing list is a significant channel for the distribution of news and information pertaining to cultural property protection, preservation, conservation, and security. On a daily basis, information is posted on www.museum-security.org as well as on the MSN Google Group. Subscribers include museum professionals, law enforcement officers, lawyers, academics, insurance underwriters, journalists, auction houses, among many others. *See* http://www.museum-security.org/

[2] Cremers sent the December 31, 2005, email to two individuals with @leo.gov email addresses. LEO stands for the Law Enforcement Agency, which is an on-line database for law enforcement agencies. One of these addresses was

  Program is the federal government's primary enforcement entity with regard to the theft of art as well as "cultural property crimes."  In the email, Cremers repeatedly asserts the Mask was stolen and believed to be in the possession of the Museum.

b. On January 4, 2006, Cremers sent another email to Magness-Gardiner asking for the FBI's assistance regarding the Mask's provenance, and re-asserting that the Mask was "stolen from the depositories in a museum in Saqqara, and that supposedly [sic] is in the collection of the Saint Louis Art Museum."  Thereafter, Cremers sent a series of emails to individuals at INTERPOL stating that he has shared information regarding the Mask's provenance with the FBI.

c. On January 13, 2006, Cremers sent an email to the Museum with the subject "(Fwd) RE: TR: STOLEN EGYPTIAN MASK IN AMERICAN MUSEUM." This email was a forward of several emails Cremers had sent on January 12 and 13, 2006, to several United States government officials including: Special Agent James McAndrew ("McAndrew") at DHS, and Magness-Gardiner.  In the forwarded emails, Cremers again alleges the Mask was stolen and in the Museum's possession, offering the following statements:

  i. "So I should think that if the Egyptian Government lodged a complaint or request with the USA Government and the FBI Crime Team (to which I am copying this), then the Museum would be obliged to answer the questions."

  ii. "The FBI is just waiting for Egypt to file a complaint.  A [sic] soon as Egypt files a complaint [sic] the FBI is expected to act."

  iii. "Maarten Raven, a Dutch archaeologist, saw the mask in the Saqqara and . . . is VERY positive that the mask in the SLAM [Museum] is the same as the one stolen in Saqqara . . . ."

---

bmagness@leo.gov, which, upon information and belief, is an email address for Bonnie Magness-Gardiner of the FBI.

8

16. Between February 14, 2006 and continuing through 2007, the Museum received several letters from Dr. Zahi Hawass, Secretary General of the Supreme Council of Antiquities for the Ministry of Culture, Cairo, Egypt ("SCA"), and an attorney for the SCA, suggesting the Mask was stolen from Egypt, demanding its return, and threatening legal action against the Museum:

    a. On February 14, 2006, the Museum received the first of several letters from Hawass regarding the Mask's provenance and stating the Museum had two weeks to begin the process of returning the Mask to Egypt; otherwise, Hawass stated he would contact INTERPOL and start legal proceedings.  Hawass's letters contained numerous inaccuracies and inconsistencies, leading the Museum to make repeated requests for clarification, and for which Hawass refused to provide many relevant documents.  The Museum responded to Hawass's letter on February 14, 2006, by disputing Hawass's allegations and expressing its willingness to return the Mask to Egyptian authorities upon verifiable proof the Mask was stolen.

    b. On March 10, 2006, the *Al-Ahram Weekly* published an article on the Internet regarding the Mask's provenance and Hawass's claim that the Mask was stolen.

    c. On October 11, 2006, Hawass his eighth letter to the Museum, this time requesting additional documentation from the Museum supporting the Museum's determination of the Mask's provenance.  On December 22, 2006, the Museum responded by sending the requested documentation with a summary of the Museum's due diligence efforts to determine the Mask's provenance.

17. In December 2010, counsel for the Museum was contacted by the United States Attorney's Office for the Eastern District of Missouri in St. Louis, to request a meeting regarding the Mask.

18. On January 13, 2011, the U.S. Attorney's Office in St. Louis hosted a meeting regarding the Mask.  In attendance were Assistant U.S. Attorneys from the St. Louis U.S.

Attorney's Office and, telephonically, the Southern District of New York, and agents from DHS in St. Louis and, also telephonically, a DHS agent stationed in Cairo, Egypt.  During this meeting, the Assistant U.S. Attorneys communicated their intention to seize and forfeit the Mask pursuant to 19 U.S.C. 1595a.  *See* Affidavit of David Linenbroker.

## COUNT I – Statute of Limitations

19. The Museum incorporates herein each and every allegation in paragraphs 1 - 18, above.

20. As early as on or about February 23, 1998, when the U.S. Department of Justice received from INTERPOL the Museum's letter specifically advising of the Museum's inquiries as to whether the Mask was "stolen or otherwise illicit", the United States government had actual or constructive knowledge the Mask was allegedly stolen.

21. As early as December 31, 2005, when Magness-Gardiner received Cremers' email alleging the Museum possessed the Mask, which according to him was probably stolen, the United States government had actual or constructive knowledge the Mask was allegedly stolen.

22. On or about January 4, 2006, when Magness-Gardiner received Cremers' e-mail alleging that the Mask was stolen and possessed by the Museum, the United States government had actual or constructive knowledge that the Mask was allegedly stolen.

23. As such, the United States government possessed, more than five years ago, either constructive or actual knowledge sufficient to discover the alleged theft of the Mask from Egypt. Pursuant to 19 U.S.C. § 1621, the United States government is time-barred from proceeding against the Museum under the Tariff Act.

WHEREFORE, Plaintiff Museum prays for a declaratory judgment that the United States government is precluded from recovering under the Tariff Act because such recovery is barred by the applicable statute of limitations, 19 U.S.C. § 1621.

## COUNT II – 19 U.S.C. § 1595a

24. The Museum incorporates herein each and every allegation in paragraphs 1- 23, above.

25. The Museum conducted a thorough investigation of the Mask's provenance before purchasing the Mask. The Museum's investigation revealed no evidence that the Mask was owned by Egypt under applicable Egyptian law at the time of excavation, that the Mask was stolen from Egypt, or that the Mask had unlawfully entered the United States.

26. Egyptian Law No. 215 on the Protection of Antiquities, the law applicable at the time the Mask was discovered and excavated, allowed for personal and private ownership of Egyptian antiquities, provided that antiquities could be sold or gifted and, as such, did not establish ownership of the Mask by Egypt.

27. The United States government cannot show probable cause the Mask was "stolen, smuggled, or clandestinely imported or introduced" into the United States. Accordingly, the United States lacks an evidentiary basis for asserting the Mask was stolen pursuant to Egyptian Law No. 215, or seizing and/or causing the forfeiture of the Mask pursuant to 19 U.S.C. § 1595a.

WHEREFORE, in the alternative, Plaintiff Museum prays for a declaratory judgment that the provisions of Egyptian Law No. 215 did not and does not establish Egypt's ownership of the Mask, nor is there probable cause to believe the Mask was "stolen, smuggled, or clandestinely imported or introduced" into the United States.

## PRAYER FOR RELIEF

28. Plaintiff Museum prays for a declaratory judgment the United States government is precluded from seizing and/or forfeiting the Mask pursuant to the provisions of the Tariff Act because such recovery is barred by the applicable statute of limitations, 19 U.S.C. § 1621.

29. Alternatively, Plaintiff Museum prays for a declaratory judgment that the provisions of Egyptian Law No. 215 did not and does not establish that the Mask is Egypt's

11

property, nor is there probable cause to believe the Mask was "stolen, smuggled, or clandestinely imported or introduced" into the United States.

30. Plaintiff Museum prays such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Jeffrey J. Simon
| | |
|---|---|
| Jeffrey J. Simon | MO #35558 |
| Patrick A. McInerney | MO# 37638 |
| McClain E. Bryant | MO# 60127 |

**HUSCH BLACKWELL LLP**
4801 Main St, Suite 1000
Kansas City, MO 64112
jeff.simon@huschblackwell.com
pat.mcinerney@huschblackwell.com
mcclain.bryant@huschblackwell.com
816.983.8000 (phone)
816.983.8080 (fax)

*ATTORNEYS FOR PLAINTIFF*

KCP-4099426-3